Laramore, Judge,
delivered the opinion of the court:
This is an action for an equitable adjustment of the contract price for alleged extra work required by defendant. This claim arises out of a contract entered into between plaintiffs and the United States through the Corps of Engineers, Department of the Army, for the construction of a large fieldhouse at Eielson Air Force Base near Fairbanks, Alaska. Plaintiffs seek reimbursement for the additional cost of the alleged extra work performed by them together with a reasonable allowance for overhead and profit.
This contract was entered into pursuant to appropriate regulations pertaining to the letting of Government contracts. On February 13, 1952, invitations for bids were issued. Attached to the invitation for bids at the time of issuance were (1) the specifications; (2) 52 drawings; and (3) Addendum No. 1, listing certain changes in the specifications. Belying on the information supplied in the invitation to bid, the plaintiffs, in the person of Mr. Anderson, prepared their bid. The opening paragraph of the specifications stated that “the site of the proposed work is at Eielson Air Force Base, approximately 26 miles from Fairbanks, Alaska, as shown on the Plot Plan.” However, the plot plan was not among the drawings furnished but was “to be furnished by addendum,” along with the grading plan.
The 52 drawings which accompanied the specifications at the time of the issuance of the invitation for bids covered four features: architectural, structural, mechanical, and electrical. Four of the drawings depicting the basement plan showed the area underneath the floor slab as “un-excavated.” Four of the drawings depicting elevation showed the top of the finish ground floor as being at elevation 0.00. The “finish grade” below the floor slab was at elevation —1.19. The existing or present grade was at *477 elevation — 4.19. Tops of footings were at elevations — 6.19; bottoms at — 8.19.
Upon receipt of the drawings and specifications, about the middle of February 1952, Mr. Anderson made preliminary computations in contemplation of preparing a bid for the joint venturers. He interpreted the “unexcavated” legends to mean that the contractor would not be required to excavate under the floor slab areas, except for footings and utility trenches. He understood the “existing” or “present” grade at elevation —4.19 to indicate the necessity for fill to finish grade at —1.19. His computations for excavation were therefore limited to the requirements for footings and other subsurface elements.
Addendum No. 2 was issued on February 29, 1952. It contained the drawings pertaining to the plot plan and grading plan. The printed portion of Addendum No. 2 reached Mr. Anderson during the early days of March. The drawings were somehow delayed for a few days. When he received them, less than a week remained before the bid-opening date of March 12, 1952.
The grading plan traced the outline of the building in a field of contour elevations. The highest elevation in the vicinity of the building was 544 feet, while the lowest was 530 feet. Within the perimeter of the building’s outlines the highest elevation was 536 feet and the lowest 530 feet. The grading plan further showed the bottom of the floor slab as being at elevation 542.08, with the finish grade outside the perimeter beginning at elevation 541.88.
At the bottom of the grading plan a section of floor was depicted. This diagram showed the finish floor at elevation 543.27 feet, the finish grade beneath the floor at elevation 542.08, the finish grade outside at elevation 541.88, the “bottom of footing” at elevation 535.10, and the “excavation line” at elevation 526.0, which line was marked “Top of non-frost susceptible material.” Between the excavation line and the underside of the finish floor there had been traced the “existing ground line” showing its variants in elevation. The cross-section area between the excavation line and the underside of the finish floor was hatched. A note explained that the hatching denoted structural fill. It is this section of Addendum No. 2 that gives rise to the present controversy. *478 The Government interpreted the provisions one way and the plaintiffs interpreted them another way. Hence, the issue of liability turns upon the reasonableness of the construction which plaintiffs, in the preparation of their bid, placed upon the contract specifications and drawings relating to excavation requirements.
Plaintiffs’ bid was mailed from Seattle by Mr. Anderson several days before the bid-opening date. The bid as prepared and mailed was in the amount of $2,250,000. It was so submitted, however, with the intention of modifying it by telegram. This was done. Just before the bid-opening date, Mr. Anderson telegraphed a reduction of $273,000, making the final bid $1,977,000. The Government’s estimate of the cost of the contract work was in the amount of $2,600,927. Nine bids were submitted, all of which were lower than the Government’s estimate.
On July 3, 1952, plaintiffs wrote to defendant’s resident engineer, explaining that they were starting to excavate but that there appeared to be a conflict in the requirements. On July 14, 1952, plaintiff actually began excavating. On July 18,1952, the defendant’s resident engineer advised plaintiffs that they were required to excavate the entire area within contract lines to the depth indicated as the excavation line on the section showing on the grading plan. The plaintiffs proceeded with the excavation as directed. As a result, the cost of performance as required by the contracting officer was greater than the cost that would have been incurred in performance of the limited excavation contemplated by the plaintiffs. It is for the difference in cost of performance as required by the contracting officer and the cost of performance as anticipated by the plaintiffs that this action is brought.
There is no question whether the work involved in the present controversy was performed satisfactorily or not. Defendant makes no issue as to that. The only question is whether plaintiffs were required to perform the work under the terms of the contract or whether it was a determination by the contracting officer that additional work was required for which an equitable adjustment should be made.
When a contractor is requested to bid on a project, he *479 must of necessity have adequate information from which to base an intelligent estimate. In this instance the information was supplied by the defendant. At the time request for bids were sent out the defendant sent along specifications, drawings, and changes. This was intended to inform prospective bidders what the project was about, what work would be required, and the necessary details from which a prospective bidder could submit an estimate. Significantly, the plot plan and the grading plan were not included with the other drawings at this time, but were to be furnished by addendum at a later date. A plot plan locates a given structure with respect to longitude and latitude. It shows where a given thing fits in with the surrounding area. A grading plan, on the other hand, raises and lowers an object according to elevation. Therefore, it is quite possible for an architect or engineer to design a structure in minute detail without regard for location or elevation. In the instant case, an arbitrary elevation of 0.00 was designated for the finish ground floor and other elevations were calculated in relation to this figure. All this information was supplied prospective bidders, with the exception of actual location and actual elevation, and they prepared their bids. Included in the information disseminated to prospective bidders were a total of four drawings that showed the large area under the floor of the fieldhouse as being “unexcavated.” The plaintiffs in preparing their bid interpreted this to mean “do not dig out.” As this amounted to a large area it made a substantial difference in cost whether this area was to be dug out and refilled or not. Based on this interpretation of the specifications the plaintiffs submitted their bid. However, about a week prior to the date for the opening of the bids the plot plan and the grading plan were received by the plaintiffs. The grading plan set the true elevation. A cut-away view of the grading plan, described as hatched previously, is the basis for the defendant’s contention that the whole area had to be excavated and refilled with nonfrost susceptible material. This single hatched drawing, which neither expressly informed the bidders to excavate the entire area to the excavation line nor by specific wording deleted the word “unexcavated,” appears at the bottom of the grading plan *480 and is explained in a footnote. Even armed with our hindsight, it would take a most cautious and unreasonable estimator to reach the conclusion that this footnote changed the general drawings and would require excavation of the entire area. It is interesting to note that the defendant estimated the cost of this project to be $2,600,927 and that all nine contractors who submitted bids were substantially lower than this. The plaintiffs’ low bid of $1,977,000 was only $12,000 lower than the next lowest bidder. This would suggest to our minds that all of the bidders were similarly mislead. It is further interesting to note that although the request for bids stated that should there be any doubt as to the meaning of the specifications a clarification should be obtained before submitting any bid, not any of the nine bidders requested such a clarification. This again would indicate that all the bidders were satisfied with their interpretation.
The defendant argues that the plans and specifications were clear and unambiguous, and to an extent we agree with defendant, but we reach an opposite conclusion. Although each of defendant’s witnesses testified that “unexcavated” meant something other than “do not dig out” each had his own definition. The Government insists that words such as “excavate,” “fill,” and “backfill,” are not terms of art but are broadly used in the profession. We reject this contention. The word “excavate” means to dig out or make hollow, hence the term “unexcavated” means the opposite. The defendant has completely failed in its efforts to show that this is not correct.
The defendant further contends that the job of a man bidding on a Government building is to give the Government what it orders, not the best that was possible to be given in the construction of the building, at the cheapest price. While we may agree with this contention by defendant, it is not apropos here. If the defendant had ordered the work, that would be one thing; but to camouflage this order in a footnote is an entirely different matter. We are of the opinion that the interpretation of the plans and specifications by the plaintiffs was reasonable under the circumstances, and that there was no need to request a clarification of these plans and specifications. This is a fact found by the commissioner and *481 adopted by the court. There is evidence that the plaintiffs encountered the exact situation on similar construction projects for barracks in Alaska, and in those instances the extra work was covered by a change order. That is what should have been done in the instant case. In a decision by this court in a case similar to the instant one, where a dispute arose from the interpretation of the excavation provisions of the contract, we stated:
* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions. [Peter Kiewit Sons’ Company v. United States, 109 Ct. Cl. 390, 418]
Although this rule pertains to the interpretation of written words in a contract, this court is of the opinion that the principle involved is dispositive of the present controversy.
We come now to the measure of damages. The Government makes a strenuous attack on the findings of the commissioner below, and on one point we agree with the Government. In plaintiffs’ estimate of what the work would have cost had they been permitted to do the work in the manner they had planned, there was an item of “fill around outside of building.” They estimated that 6,229 cubic yards of material would have been required, at 85 cents per cubic yard. However, their estimate of the cost of actual performance shows 6,299 cubic yards costing $2 per cubic yard. As stated previously, we can see no reason why the fill outside the building lines when actually performed should exceed the 85 cents per cubic yard as estimated originally. Nor does it make any difference whether the yardage is 6,299 or 6,229, since plaintiffs were obligated under the contract to perform this portion of the work. Thus, if the item on the estimate of costs of fill, had the work been performed in the *482 manner plaintiffs contend and the estimate of work actually performed on fill were both eliminated, as they should be, the result would be a difference of $60,849.50, which plaintiffs are entitled to recover.
The Government further resists plaintiffs’ demand for damages by insisting that they be cut in half because they contend that plaintiffs intended to completely excavate the north half of the area. The Government offers the testimony of Mr. Bingham to support this contention. It is hardly necessary to point out to the Government that Mr. Bingham was not the person in charge of the project, and when he became aware of plaintiffs’ plans is irrelevant. The person that ordered the plaintiffs to excavate the entire area was Mr. White, who is now deceased. The controversy was brought to the attention of Mr. White shortly after July 3, 1952, in the form of a letter from the plaintiffs. Therefore, any claim by the Government to reduce the number of days delay as a result of the dispute must likewise be denied. Mr. Bingham did not begin his position at the site until July 14, 1952, so he is hardly an authority as to what transpired previously.
If the plaintiffs had been permitted to perform the work in the manner they had planned the direct cost incurred would have been:
Item Cost
Excavation 4,669 c.y. @ $0.50_ $2,334. 50
Backfill 4,669 c.y. @ $2.00- 9, 338. 00
Structural fill 13,502 c.y. @ $2.00_ 27, 004.00
Total_$38, 676. 50
Set forth below is an estimate of the direct costs that were actually incurred:
Excavation 26,160 c.y. @ $0.50_$13,080.00
Fill, inside bldg, lines 43,223 c.y. @ $2.00_ 86, 446. 00
Total_$99, 526. 00
The difference between the direct costs of performing the work as required by the contracting officer and the direct costs that would have been incurred in performing the work as planned and required was $60,849.50.
*483 In addition, plaintiffs were delayed a total of 16.6 working days by tlie contracting officer’s requirement. The plaintiffs were on a 6-day work week; therefore, this amounted to 18.6 calendar days. The commissioner found and the defendant agrees that $300 per calendar day is a fair measure of damages caused by the delay. This amounts to $5,580 for the 18.6 calendar days of delay.
There is no evidence from which to determine whether or not plaintiffs included a margin of profit in their estimates of direct costs. It is not established by the evidence that plaintiffs suffered a loss of profits, in addition to the loss of direct costs and overhead, as a result of the extra work and delay.
On the basis of other contracts performed by plaintiffs in Alaska about the same time, the average ratio of overhead to direct costs was 3.8 percent, which in this instance would amount to $2,312.28.
For the reasons given above, it is determined by the court that the plaintiffs should recover in the total amount of $68,741.78, and judgment will be entered in that amount.
It is so ordered.
Durfee, Judge; Madden, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) The contract in suit[1] was executed on June 10, 1952,[2] between the plaintiffs[3] and the Army. It called for the construction of a fieldhouse at Eielson Air Force Base, near Fairbanks, Alaska.
(b) The issue of liability turns upon the reasonableness of the construction which plaintiffs, in the preparation of *484 tbeir bid, placed upon the contract specifications and drawings relating to excavation requirements.
(c) Plaintiffs’ bid was prepared by Mr. Martin Anderson, president of the Anderson Construction Company, Inc. When the bid was prepared, Mr. Anderson had been in the construction business for 35 years. He had had wide experience in reading plans and specifications, in making estimates, and in preparing bids. He had also had extensive experience with construction contracts in Alaska, including the Fairbanks area.
(d) The contract contained standard clauses relating to (1) changes and extras[4] and (2) disputes.[5] After the dis *485 pute hereinafter outlined arose between plaintiffs and the contracting officer, plaintiffs duly pursued and exhausted their administrative remedies before filing suit in this court.
2. (a) The invitation for bids was issued on February 18, 1952. It contained the following clause:
Bidders should carefully examine the drawings and specifications, visit the site of the work, and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer and obtain clarification prior to submitting any bid.
(b) Attached to the invitation for bids at the time of issuance were (1) the specifications, consisting of four parts;[6] (2) 52 drawings; and (3) Addendum No. 1, listing certain changes in the specifications as hereinafter noted.
(c) These documents were received by Mr. Anderson about the middle of February 1952.[7]
3. (a) The opening paragraph of the Statement of Work specified that “the site of the proposed work is at Eielson Air Force Base, approximately 26 miles from Fairbanks, Alaska, as shown on the Plot Plan.” The plot plan was not among the drawings furnished. Paragraph 2 of the Special Conditions listed the plot plan and the grading plan as drawings “to be furnished by addendum.”
(b) Paragraph SC-2 further provided:
* * * The work shall conform to the following drawings, all of which form a part of these specifications and are available in the Office of the District Engineer, Alaska District, Anchorage, Alaska. In case of a difference between the Technical Provisions and Special Conditions the latter shall govern; in case of a difference between the small-scale and large-scale drawings the latter shall govern; in case of a difference between scaled and given dimensions the latter shall govern; *486 and in case of a difference between the Drawings and the written specifications the latter shall govern.
At the end of the paragraph was (1) the note, mentioned above, that the plot plan and the grading plan would be furnished by addendum, and (2) a list of 52 drawings.
(c) Two exhibits (A and B) were attached to the specifications. Exhibit A contained only the notation “To be furnished by Addendum.”
4. (a) Section 1 of the Technical Provisions, headed “Excavation, Filling, and Backfilling,” as amended by Addendum No. 1, contained the following:
1-01 scope: The work covered by this section of the specifications consists in furnishing all plant, labor, equipment, appliances and materials, and in performing all operations in connection with the excavation, filling, and backfilling, complete, in accordance with the specifications and applicable drawings.
1-02 work not included: Excavation, filling, and grading for roads, streets, railroads, parking areas, sidewalks, runways, aprons, drainage and other subsurface utilities systems, * * * outside the building line are not included under this section of the specifications.
1-03 extent oe excavation : The contractor will be required to complete all excavation to the dimensions and elevations indicated on the drawings, and all costs in connection therewith shall be considered incident to and included in the lump sum contract price for the building or structure for which the excavation is required.
1-04 excavation :
a. General: The area bounded by lines 25 feet outside the foundation walls or the lines formed where the toe of the grade slope meets the existing gromid level, whichever is greater, shall be cleared of all trees, stumps, roots and other natural obstructions and all existing foundations, pavements, utility lines and other items which will interfere with the construction operations. The Contractor shall perform all excavation to the “line of excavation for base bid” as shown on the Grading Plan. However if in the opinion of the Contracting Officer, unsuitable soil conditions (such as frost-susceptible materials) are encountered at the line of excavation, he may direct that extra excavation be performed. The Contractor shall perform such extra excavation only when so directed in writing by the Contracting Officer and the extra work shall include, as one unit of opera *487 tion both, the necessary excavation and the placement and compaction of fill required to restore the excavation to the depth indicated on the drawings, also, if in the opinion of the Contracting Officer suitable soil conditions (such as non-frost-susceptible materials) are _ encountered above the “line of excavation” he may direct the Contractor in writing that further excavation is not required. When excavation is carried to a line either above or below the “line of excavation” an equitable modification of the contract will be made.
5. Drainage in. Vicinity of Buildings and Other Structures: The contractor shall control the grading in the vicinity of buildings and other structures so that the surface of the ground will be properly sloped to prevent water from running into the excavated areas. Any water which accumulates in the excavation shall be removed promptly.
c. Shoring .' Such shoring, including sheet piling, as may be required during excavation shall be installed to protect the banks, adjacent paving, structures, and utilities.
d. Excess Material: Excess material from excavation, not required for fill or backfill, shall be wasted in areas indicated on the drawings; or if the drawings do not indicate spoil areas, excess materials shall be wasted in areas adjacent to the work as approved by the Contracting Office.
e. Removal of Utilities: When utility lines are encountered within the area of operations, the contractor shall notify the Contracting Officer in ample time for the necessary measures to be taken to prevent interruption of the service.
1-05 pilling: Fill for buildings shall be to the elevations indicated on the drawings such fill shall consist of excavated non-frost-susceptible material, approved by the Contracting Officer or where the above is not in sufficient quantity, suitable material from the Government pit shall be used as specified in the Special Conditions. Fill shall be placed in layers not exceeding 8 inches in thickness and thoroughly compacted by hand or machine tampers or other suitable equipment of a type approved by the Contracting Officer. Each layer shall be moistened during compaction to optimum moisture content and compacted to ninety per cent of maximum density under slabs, and ninety-five per cent of maximum density under footings, with maximum density determined by the standard Corps of Engineers modified A.A.S.H.O. tests.
*488 1-06 DEFINITION OF FROST-SUSCEPTIBLE MATERIAL: Frost-susceptible soils are generally defined as inorganic soils containing more than 3 per cent by weight of particles finer than 0.02 mm. and are further defined as follows:
a. Gravelly soils containing between 3 and 20 percent finer than 0.02 mm. by weight.
5. Sands containing between 3 and 15 percent finer than 0.02 mm. by weight.
c. (1) Gravelly soils containing more than 20 percent finer than 0.02 mm. by weight and sands, except fine silty sands, containing more than 15 percent finer than 0.02 mm. by weight. (2) Clays with plasticity indexes of more than 12 except varved clays.
d. (1) All silts including sand silts. (2) Fine silty sands containing more than 15 percent finer than 0.02 mm. by weight. (3) Lean clays with plasticity indexes of less than 12. (4) Yarved clays.
1-07 final grading: At the completion of the construction, the area within lines 10 feet outside the building foundations shall be brought up to within six inches of the finish grade shown on the drawings and shall be graded to slope slightly away from the building. The degree of finish shall be that ordinarily obtained from blade grader operations. Material at the 10-foot line shall be sloped away therefrom at the natural angle of repose to meet the existing surrounding grades.
Paragraphs l-0Na, 1-05, and 1-06, as originally drawn and printed in the specifications (i.e., unchanged by Addendum No. 1), had been as follows:
1-04 excavation :
a. General: The site indicated on the drawings shall be cleared of all trees, stumps, roots and other natural obstructions and all existing foundations, pavements, utility lines, and other items which will interfere with the construction operations. The Contractor shall perform all excavation required regardless of the type of materials encountered. The excavation shall conform to the dimensions and elevations indicated on the drawings or specified herein for each building and structure, and shall include trenching for utility systems to a point 5 feet beyond the building line of each building and structure, and all work incidental thereto. Excavation shall not be carried below the elevations indicated on the drawings or specified herein. Where the excavation is made below the elevations indicated on the drawings or *489 specified herein, the excavation, if under slabs, shall be restored to the proper elevation in accordance with the procedure hereinafter specified for fill, or if under footings, the heights of the walls or footing shall be increased, as may be directed by the Contracting Officer. Excavation shall extend a sufficient distance from walls and footings to allow for placing and removal of forms, installation of services, and for inspection, except where the concrete for walls and footings is authorized to be deposited directly against excavated surfaces. Undercutting will not be permitted. Top soil, and suitable excavated material which is required for fill under slabs, shall be separately stockpiled as directed by the Contracting Officer.
1-05 Killing: Where concrete slabs are placed on earth, all loam and organic or other undesirable material as determined by the Contracting Officer, shall be removed. Where fill is required to raise the sub-grade for concrete slabs to the elevations as indicated on the drawings or as specified herein, such fill shall consist of broken stone, sand, gravel, or other material approved by the Contracting Officer. Where broken stone, sand, or gravel is used for fill, it shall be placed in layers not exceeding 12 inches in thickness and thoroughly compacted with a roller of a type approved by the Contracting Officer. When earth is used for fill, it shall be placed in layers not exceeding 8 inches in thickness. Each layer shall be moistened during compaction to optimum moisture content and compacted to ninety percent of maximum density under slabs, and ninety-five percent of maximum density under footings, with maximum density determined by the standard Corps of Engineers modified A.A.S.H.O. tests. Frost-susceptible materials shall not be used for fill. Frost-susceptible materials are defined as soil materials containing more than three percent by weight of particles finer than 0.02 millimeter.
1-06 bacKttlling : After completion of foundation footings and walls, piling, and other construction below the elevation of the final grades, and prior to back-filling, all forms shall be removed and the excavation shall be cleaned of all trash and debris. No back-filling shall be done until construction work to be covered by backfill has been inspected and approved by the Contracting Officer. Material for backfilling shall consist of the excavation, or borrow of sand, gravel or other material approved by the Contracting Officer, and shall be free of trash, lumber, or other debris. Backfill shall *490 be placed, in horizontal layers not in excess of 9 inches in thickness, and shall have a moisture content such that the required degree of compaction may be obtained. Each layer shall be compacted by hand or machine tampers or by other suitable equipment to a density that will prevent excessive settlement or shrinkage. Backfill shall be brought to a suitable elevation above grade to provide for anticipated settlement and shrinkage thereof.
5. (a) The 52 drawings which accompanied the specifications at the time of the issuance of the invitation for bids covered four features: architectural, structural, mechanical, and electrical. Such of these drawings as are material here were drawn to a scale of ys of an inch to 1 foot. In order to accommodate the scaled drawings on standard size paper, the building was depicted in two sectors, sector 1 being on one sheet and sector 2 on another.
(b) Four of the drawings (2 architectural[8] and 2 structural [9]) depicting the basement plan showed the area underneath the floor slab as “unexcavated.”
(c) Four of the drawings (2 architectural[10] and 2 structural[11]) depicting elevations showed the top of the finish ground floor as being at elevation 0.00, with plus or minus marks to denote elevations above and below. The “finish grade” below the floor slab was at elevation —1.19. The “existing” or “present” grade was at elevation —4.19. Tops of footings were at elevations — 6.19; bottoms at — 8.19.
6. Upon receipt of the drawings and specifications, about the middle of February 1952, Mr. Anderson made preliminary computations in contemplation of preparing a bid for the joint venturers. He interpreted the “unexcavated” legends to mean that the contractor would not be required *491 to excavate under tbe floor slab area, except for footings and utility trenches. He understood the “existing” or “present” grade at elevation —4.19 to indicate the necessity for fill to finish grade at —1.19. His computations for excavation were therefore limited to the requirements for footings and other subsurface elements. These requirements he found to be 4,084 cubic yards of excavation. He estimated the requirements of fill to be 7,810 cubic yards under the slabs[12] and 1,785 cubic yards for grading outside the perimeter of the building,[13] being a total of 9,095 cubic yards of fill.[14]
7. (a) Addendum No. 2 was issued on February 29, 1952. It gave substance to Exhibit A[15] and issued the drawings heretofore noted (plot plan and grading plan).
(b) The printed portion of Addendum No. 2 reached Mr. Anderson during the early days of March. The drawings were somehow delayed for a few days. When he received them, less than a week remained before the bid-opening date (March 12).
8. (a) Paragraph 5 of the Special Conditions provided that the Government would furnish, from its own sand and gravel pit—
* * * Pit run material suitable for fill or backfill for use in connection with the work of this contract in the amount shown in Exhibit A. Quantity furnished without charge is based upon loose truck measure.
(b) Exhibit A, issued by Addendum No. 2, specified, as part of Government furnished property—
*492 * * * Not more than 47700 cubic yards of material suitable for fill or backfill * * *.[16]
9. (a) The plot plan, drawn to a scale of 1 inch equals 200 feet, located the fieldhouse as being 100 feet south of “T” street, extending approximately 437.5 feet east and west, with the west end of the building 85 feet from the center of “M” street and the east end 85 feet from the center of “C” street. The course of Garrison Slough was shown to extend through the center of the building site, with contour markings showing the elevations of both banks of the slough at 530 feet. Other contour markings indicated elevations of 535 feet nearby. A note on the drawing stated: “Excavation shall not be carried below an elevation of 526 ft., unless otherwise directed by the Contracting Officer.”
(b) Six drill holes, with accompanying logs, were shown on the plot plan. Three were within the perimeter of the proposed building. The other three were outside. Following is a summary of the three holes which were inside the building lines.
(1) DH-8. 0' at elevation 534.1. Drilled to elevation 473.1 (61 feet). 0' to 8.0', sandy silt (43%). [8.0' marked elevation 526.1.]
(2) DH-11. 0' at elevation 531.7. Drilled to elevation 469.7 (62 feet). 0' to 3.0', gravel fill, 3.0' to 13.0', gravelly sand (49%).
(3) DH-12. 0' at elevation 534.8. Drilled to elevation 477.8 (57 feet). 0' to 4.0', silt. 4.0' to 7.0', silty (19%) gr. sand (57% ). Below 7.0', gravelly sand.
These borings indicated that elevation 526 was approximately the lowest point at which frost susceptible material would be discovered.
*493 10. (a) The grading plan, drawn to a scale of 1 inch equals 40'8", traced the outline of the building in a field of contour elevations. The highest elevation in the vicinity of the building was 544 feet, while the lowest was 530 feet. Within the perimeter of the building’s outlines the highest elevation was 536 feet and the lowest 530 feet.[17]
(b) The grading plan further showed the bottom of the floor slab as being at elevation 542.08, with the finish grade outside the perimeter beginning at elevation 541.88.
(c) At the bottom of the grading plan a section of floor was depicted, at a scale of 1 inch to 20 feet. This diagram showed the finish floor at elevation 543.27 feet, the finish grade beneath the floor at elevation 542.08, the finish grade outside at elevation 541.88, the “bottom of footing” at elevation 535.10, and the “excavation line” at elevation 526.0, which line was marked “Top of non-frost susceptible material.”
Between the excavation line and the underside of the finish floor there had been traced the “existing ground line,” showing (in cross-section) its variants in elevation.
The cross-section area between the excavation line and the underside of the finish floor was hatched. A note explained that the hatching denoted structural fill.
(d) The foregoing floor section was designated “Section A-A,” and was located on the contour drawing by a line extending lengthwise through the building. At each end of the line was a right-angle prong terminating in an arrowhead with the letter “A” above it. The arrows pointed north. The building area north of the line included only a third of the total building area. The floor section itself was not marked “typical.”
11. Plaintiffs’ bid was mailed from Seattle by Mr. Anderson several days before the bid-opening date (March 12).[18] The bid as prepared and mailed was in the amount of *494 $2,250,000. It was so submitted, however, with the intention of modifying it (by lowering the amount) by telegram. This was done. Just before the bid-opening date Mr. Anderson telegraphed a reduction of $273,000, making the final bid in the sum of $1,977,000.[19]
12. (a) Upon receipt of the grading plan Mr. Anderson recomputed the excavation work. The results of Ms recom-putation are not in evidence.[20] The method by wMch the re-computation was made is described hereinbelow.
(b) In examining the grading plan, Mr. Anderson’s attention was initially drawn to the fact that, with some of the contours more than 8.19 feet below the underside of the floor slab, footings in those areas would be hanging in midair. It would obviously have been necessary either to lower the footings and extend the columns beyond specified dimensions or build the ground level up to the footings. He concluded that the latter represented the proper solution. He planned, therefore, to excavate for the footings down to elevation 526 (the “excavation line” and “top of non-frost susceptible material”) and to fill, first to the bottom of the footings, then to build the footings and columns, and then to fill, on “existing ground level,” to the slab level.[21]
(c) In arriving at his conclusion, Mr. Anderson felt that he could not prudently ignore the “unexcavated” features of the architectural and structural drawings.[22] These were the larger scale drawings,[23] and he interpreted the word “unex- *495 cavated” to mean “exactly what it says: That it is not excavated.”[24]
(d) In Mr. Anderson’s judgment: (1) the grading plan “gave some information” but “not all of the information;” (2) nothing in the grading plan or in Addendum No. 2 deleted the word “unexcavated” from the architectural and structural drawings; (3) the grading plan did confirm the requirement of some excavation down to elevation 526;[25] (4) there was no reason to excavate the entire area down to 526, and refill it to the extent of 16 feet, when only a small fraction of the area was designed as load-bearing; and (5) the elimination, by Addendum No. 1, of the specification section relating to backfill confirmed his opinion that the “unexcavated” areas were to remain, since there would be no backfill.[26]
(e) Among elements in the specifications and drawings which Mr. Anderson was unable to reconcile were:[27] (1) the hatching in Section A-A on the grading plan;[28] and (2) the volume of fill designated in Exhibit A.[29]
(f) Having arrived at the solution stated by the reasoning hereinabove outlined, Mr. Anderson (1) did not consider it necessary to ask for a clarification and (2) believed *496 the time to be too short to obtain a clarification, if requested.[30]
13. (a) The Government’s estimate of the cost of the contract work was in the amount of $2,600,927.
(b) Nine bids were submitted. All were lower than the Government estimate. The range was from $1,977,000 (the lowest) to $2,588,000 (the highest). The bid which was next to the lowest was in the amount of $1,989,613. All others were in the range of $2,200,000 and above.
14. (a) Plaintiffs’ failure to ask for a clarification of the plans and specifications was not unreasonable under the circumstances.[31]
(b) The plans and specifications were susceptible of the interpretation given them[32] by plaintiffs in the preparation of their bid, and that interpretation was reasonable under the circumstances.[33]
15. (a) On July 3, 1952, plaintiffs wrote to defendant’s resident engineer:[34]
*497 We are starting to excavate for the Field House under the subject contract. There appears to be a confliction in the requirements under this contract.
Architectural drawing 31-13-02, sheets 1 and 4, also structural drawing 31-13-02, sheets 23 and 32, indicate that all areas in both sectors 1 and 2 are unexcavated with the exception of areas under footings, pipe trenches, pipe gallery and swimming pool.
Drawing 11-01-29, sheet 1, indicates in section AA excavation line elevation 526.
The requirements of these drawings do not agree and it is requested that a clarification be given us at the earliest possible date.
We presume the larger scale architectural and structural drawings, as well as the explicit words thereon noted “unexcavated,” will govern.
(b) On July 18, 1952, the resident engineer replied:
Reference is made to conversations held in this office * * * regarding the contract requirements for subject contract excavation.
You are advised that the contract requirements are for excavating the entire area within contract lines to the depth indicated as the excavation line on the section showing on the grading plan. The grading plan was made a part of the contract by Addendum No. 2 to the contract specifications.
(c) Plaintiffs proceeded with the excavation as directed.[35] This meant excavating the entire site to 526, refill to the bottoms of the footings, and construction of the footings, columns, and foundation walls, followed by fill to the underside of the floor slab.[36]
16. (a) The cost of performance as required by the contracting officer was greater than the cost that would have been incurred in performance as contemplated by plaintiffs in their bid.
(b) The work demanded by the contracting officer required more time than would have been required by the work *498 as planned by plaintiffs, resulting in a delay in the completion of the work.
(c) At or about the same time, plaintiff constructed other buildings for the Air Force in Alaska. When confronted with a similar situation, the extra work entailed was covered by a change order, and plaintiff was paid on that basis.
17.(a) Set forth below is plaintiffs’ estimate of the direct costs that would have been incurred if the work had been performed as planned.[37]

Item Cost

Excavation, 4669 c.y. @ .50_ $2,334.50 Backfill areas excavated from elevation 526 to existing
grade, 4669 c.y. @ $2_ 9,338. 00 Structural fill from existing grade to bottom of first floor
construction, 13,502 c.y. @ $2_ 27, 004.00 Fill around outside of building using excavated material,
6,229 c.y. @ .85_ 5,354.15
Total_ $44,030.65
(b) The evidence as a whole warrants the inference that the foregoing estimate represents a reasonable approximation of the costs that would have been incurred if the work had been performed as planned.
18.(a) Set forth below is an estimate of the direct costs that were incurred in the performance of the work as required by the contracting officer.[38]
Excavation, 26,160 c.y. @ .50_ $13, 080. 00
Fill, inside building lines, 43,223 c.y. @ $2_ 86, 446.00
Fill, outside building lines, 6,299 c.y. @ $2_ 12, 598. 00
Total_$112,124.00
19.(a) The difference between the direct costs of performing the work as required by the contracting officer and the *499 direct costs that would have been incurred in performing tlie work as planned was $60,849.50.
(b) This sum ($60,849.50) represents the direct costs incurred by plaintiffs for extra work as a result of the contracting officer’s requirement.[39]
20. (a) Excavation work was begun on July 14 and completed on July 22, 1952, being 8 working days. Filling was begun on July 25 and was brought up to the bottoms of the footings on August 6, 1952, being 18 working days. Work on the footings and foundations occupied the time from August 6 to October 11, 1952. Filling above the first stage level to the underside of the floor slabs was begun on October 11 and completed on October 15, 1952, being 4 working days. The total time used for excavation and fill was 25 days, being 8 days for excavation and 17 days for fill.
(b) If the work had been performed as planned, excavation would have required 1.5 days and fill would have required 6.9 days, for a total of 8.4 working days.[40]
(c) Plaintiffs were delayed a total of 16.6 working days (18.6 calendar days) by the contracting officer’s requirement.
21. As a consequence of such delay, plaintiffs incurred extra costs for salaries of supervisory personnel, idle time for equipment, additional wages (due partly to wage increases and partly to the inefficiency of labor in extremely cold weather), and utilities. It is impossible to determine from the evidence with precision the amounts allocable to these items as extra costs. The evidence as a whole warrants the inference that, considered together, these extra costs amounted to $300 per calendar day, being a total of $5,580 for the 18.6 calendar days of delay.
*500 22. (a) On the basis of three construction contracts [41] performed by plaintiffs in Alaska during the years 1951-1954, the average ratio of overhead to direct costs was 3.8 percent, and the average ratio of profits to total cost was 15.5 percent.[42]
(b) It is not established by the evidence that such liabilities as plaintiffs may have incurred for additional premiums on performance bonds and business taxes were not included in their overhead allowances, in conformity with customary accounting practices.
23. (a) If the plaintiffs are entitled as a matter of law to recover, the amount of the recovery should include the sum of $66,429.50, representing extra costs of $60,849.50 for extra work and $5,580 for delay incurred as a result of the contracting officer’s requirement.
(b) The addition of a 3.8 percent of direct costs for extra work, as an allowance for overhead, would be necessary to reimburse for total costs. This allowance would be in the sum of $2,312.28, making the total recovery $68,741.78.
(c) There is no evidence from which to determine whether or not plaintiffs included a margin of profit in their estimates of direct cost. It is therefore not established by the evidence that plaintiffs suffered a loss of profits, in addition to the loss of direct costs and overhead as hereinabove determined, as a result of the extra work and delay.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover. It is, therefore, adjudged and ordered that the plaintiffs recover of and from the United States the sum of sixty-eight thousand, seven hundred forty-one dollars and seventy-eight cents ($68,741.78).

 Contract No. DA-95-507-ENG-308.

 Bids were opened on March 12, 1952. The Army deferred the award of the contract, with plaintiffs’ consent, for a period of 30 days.

 Plaintiffs were joint venturers. The Anderson Construction Company, Inc., is a corporation under the laws of the State of Washington. Montin-Benson Corporation is a Delaware corporation. The two corporations entered into a joint venture agreement in December 1950.

 Following is the test of the changes and extras clauses: “The contracting officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the contractor for adjustment under this Clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of extra or change: Provided, however, That the contracting officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the contractor from proceeding with the prosecution of the work as changed.”

 Following is the text of the disputes clause: “Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after receipt thereof by the contractor, he appeals in writing to the Secretary of the Army, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary of the Army, his written decision, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary of the Army may designate an individual, or individuals, other than the Contracting Officer, or a board, as his authorized representative to determine appeals under this article. In any proceeding under the provisions of this article, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending decision of a dispute hereunder the contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the contractor under the provisions of this article shall be paid by the Government as part of the cost of the work herein contracted for and shall be deemed to be within the contemplation of this contract.”

 Part I, Statement of Work; Part II, General Conditions; Part III, Special Conditions; and Part IV, Technical Provisions.

 Mr. Anderson was unable to recall with certainty the sequence in which the several documents were received. His recollection of the work done preliminary to the preparation of the bid indicates that he received the printed specifications and the 52 drawings before he received Addendum No, 1*

 Architectural Drawings Nos. 1 and 4, depicting the basement plan of sector 1 and sector 2, respectively.

 Structural Drawings Nos. 101 and 110, depicting the basement and foundation plan of sector 1 and sector 2, respectively.

 Architectural Drawings Nos. 8 and 9, showing the elevations of sectors 1 and 2, respectively.

 Structural Drawings Nos. 108 and 117, showing the elevations of sectors 1 and 2, respectively.

 A depth of 1 yard (3 feet) under the slabs (being the difference between the —4.19 elevation of the “existing” grade and the —1.19 elevation of the “finish” grade) accounted for Mr. Anderson’s allowance of 7,310 cubic yards of fill. Translating this figure into square feet, the slabs occupied 65,790 square feet.

 The perimeter of the building measured approximately 1,500 feet. Fill to a depth of 2.5 feet at the perimeter, carried out 10 feet and then sloped to grade at 25 feet from the perimeter, accounted for the 1,785 cubic yards for outside grading.

 The proportions divide (approximately) 80 percent under the slabs and 20 percent for outside fill.

 Cf. finding 3 (c).

 The quantity was stated in terms of loose truck measure. If, as may be inferred from the evidence as a whole, the specifications intended to provide fill only for the area beneath the floor slab, the quantity was computed on the basis of a shrinkage in compaction of 18 to 20 percent. (The space under the floor slab which the Army required to be refilled after excavation represented 39,000 cubic yards.)
On the other hand, if the specifications intended the fill material for use outside the building as well as under the floor slab, and if no allowance was made for compaction, the proportions heretofore determined from Mr. Anderson’s computations (80 percent under the slab ; 20 percent outside) would call for 38,160 cubic yards under the slab.
In either event, the lineal depth of fill beneath the slab would be approximately 16 feet, representing the distance between elevations 642 and 526, as ultimately required by the Army.

 Figures, as stated, were shown on the grading plan. Additional contour lines, inside Garrison Slough, indicated a small lake or pond within the building perimeter. The depth of the pond was not shown.

 It Is to be inferred from the evidence as a whole that the bid was mailed either just before or just after the grading plan was received by Mr. Anderson, and before he had recomputed the excavation work. The telegraphic modification occurred after Mr. Anderson had recomputed the excavation work, as stated in subsequent findings.

 This was an arbitrary figure. Mr. Anderson testified that it was not necessarily based upon his final estimate of excavation costs.

 Mr. Anderson testified that he gave the figures to his attorneys, who never returned them to him. (Plaintiffs’ attorney of record in this court did not represent them in the administrative proceedings before the Corps of Engineers Claims and Appeal Board or the Armed Services Board of Contract Appeals.)

 Mr. Anderson testified: “I figured it two or three ways. It toot a little experimenting and practice, because it was a little confusing to start with. But that [as hereinabove described] is the one I bidded up. I figured that was the soundest one and the most stable one, and would also comply with the architectural drawings, insofar as having an unexcavated area between the structural features.”

 Mr. Anderson testified that the new drawings “necessitated mating some changes in our estimates and quantities, for the reason that the grading plan contained information that didn’t agree with the information contained on the architectural drawings.”

 Cf. finding 3 (b), wherein is recited the provision that “in case of a difference between the small-scale and large-scale drawings the latter shall govern.”

 A witness for plaintiffs testified that in his experience as a builder the word “unexcavated” means “do not dig here.”

 He toot the “line of excavation” to mean a requirement to excavate to 526 for structural features only. The excavation line meant to him, good, stable, load-bearing material. This was the extent of his consideration of non-frost susceptible material, since he thought the heating of the building would take care of frost susceptible material, if any, beneath the floor slabs.

 According to his interpretation, refill after excavation to 526 would have been backfill.

 Mr. Anderson testified: “I had a little tussle and confusion with myself, but after weighing all the requirements of the original plans and specifications and addendums, I though I was giving * * * the best that was possible to be given in the construction of the building, at the cheapest price.”

 This, he said, was confusing, and since it did not agree with the architectural drawings, he ignored it. His warrant for doing so, he testified, lay in the facts that (1) the arrows locating Section A-A on the building site pointed in one direction only, when the usual practice would be to indicate a sweep; (2) the word “typical” was not on the section; and (3) if the draftsman had intended the section to cover the entire site, he could have said so in words or symbols.

 He understood the 47,700 cubic yards of fill to be intended for use on the existing grade to bring the ground up to the floor slab. Computation indicated to him that 47,700 cubic yards represented more than would be needed, but the specification was “not more than” 47,700 cubic yards (wherefore the amount could have been substantially less) of “loose truck measure” (which meant reduction by compaction). Moreover, he said, in his experience “the Corps of Engineers is not always accurate in their quantities.”

 under methods followed by the Corps of Engineers in issuing clarifications, requests from contractors were first considered on their merits (i.e., was a clarification of the point raised by the contractor warranted?) and, when determination was made to issue a clarification, it was done by addendum addressed to all potential bidders. Such a process, if inaugurated in March 1952, would have meant postponement of the bid-opening date. If Mr. Anderson had requested a clarification, and if he had postponed the submission of a bid pending response to his request, he might have missed the bidding entirely.

 Among the circumstances time and distance were important factors, particularly in view of the hnown deliberation by the Corps of Engineers over requests for clarification. The bids were to be opened in Anchorage, Alaska, on March 12, 1952. The potential bidders all had offices in the south 48. By the time plaintiffs became aware of the possible need for clarification (upon receipt of the grading plan), only a week or so remained before the bid-opening date. While airmail provided fast service to and from Anchorage, it was dependent upon the weather. Assuming the mails would go through, there remained the possibility (which plaintiffs were warranted in considering a probability) that a request for clarification at such a late date might, if they waited for an answer, result in frustration of their effort to submit a bid.

 The weight of the evidence supports plaintiffs’ contention that the word “unexcavated,” when used in architectural and structural drawings, generally means “do not dig here.”

 In view of the factors of time and distance, and the nearness of the bid-opening date when the grading plan was made available to potential bidders, rational reconciliation of the manifest conflicts between the grading plan and the architectural and structural drawings was warranted. Plaintiffs' reconciliation of those conflicts was in the owner’s interest from the standpoint of cost and in their own interest from the standpoint of competition with other bidders.

 Before this letter was written, a difference of opinion between representatives of the Government and the contractor had appeared in the course of conversations. The letter was written to formalize the issue.

 In due course plaintiffs (1) demanded and received a ruling by tbe contracting officer (which was adverse) ; (2) presented a claim to the contracting officer (which was denied) ; and (3) perfected appeals to (a) the Corps of Engineers Claims and Appeal Board and (b) the Armed Services Board of Contract Appeals (both of which were denied).

 The engineering basis for the requirement of excavation to 526, followed by fill to the floor slab, was the elimination of frost susceptible material.

 This estimate was prepared by plaintiffs for use In tbis case. There Is no evidence of cost estimates made at the time the bid was prepared.

 The unit costs applied to this estimate were drawn from plaintiffs’ estimate of the costs that would have been incurred if the work had been performed as planned.
The quantities were estimated by Mr. Anderson after plaintiffs were directed by the resident engineer to excavate the entire area. (Mr. Anderson testified, on cross-examination, that he prepared the estimate after he received the grading plan and prior to the modification of the bid. Other evidence demonstrates, however, that he was mistaken as to the time, and that the estimate was made after plaintiffs received the resident engineer’s directive.)

 At the trial, plaintiffs offered evidence, upon which they now rely, to show that the difference in costs was $83,995.22. The support for their figure consisted of (1) various book entries relating to equipment and material and (2) estimates of labor costs. All of such evidence is so lacking in certainty as to warrant its rejection in favor of the estimates hereinabove cited.
Defendant has submitted the figure of $44,534.73 as representing the extra costs. Its figure was derived from plaintiffs’ book entries and labor cost estimates after allowances for uncertainties disclosed by the audit.

 This comparison is made in terms of (1) all excavation and (2) fill within the building lines only. Fill outside the building lines was completed in 1953.

 The contract in suit was one of the three.

 The use of averages is requisite to a fair determination because of the methods used by plaintiffs in keeping their books.